**FILED UNDER SEAL**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* ) | **FILED UNDER SEAL** |
| ) | PURSUANT TO |
| DANAH HAYES, ) | 31 U.S.C. § 3730(b)(2) |
| ) | |
| ) | CIVIL ACTION NO. _____ |
| ) | |
| Plaintiff-Relator ) | **COMPLAINT AND** |
| ) | **JURY TRIAL DEMAND** |
| BRINGING THIS ACTION ON BEHALF OF ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| c/o ) | |
| ) | |
| U.S. ATTORNEY FOR THE ) | |
| Eastern District of Texas-Sherman Division ) | |
| 600 East Taylor Street, Suite 2000 ) | |
| Sherman, Texas 75090 ) | |
| ) | |
| ATTORNEY GENERAL OF ) | |
| THE UNITED STATES ) | |
| U.S. Department of Justice ) | |
| 950 Pennsylvania Avenue, NW ) | |
| Washington, DC 20530-0001 ) | |
| ) | |
| ) | |
| ) | |
| v. ) | |
| ) | |
| LAKE LODGE NURSING AND ) | |
| REHABILITATION, LP ) | |
| 3800 Marina Drive ) | |
| Lake Worth Texas, 76135 ) | |
| ) | |
| DAYBREAK VENTURE, LLC ) | |
| 401 N. Elm ) | |
| Denton, TX 76201 ) | |

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 1**

## PLAINTIFF-RELATOR'S ORIGINAL COMPLAINT

1.     This is an action filed under the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. Sec. 3729, *et seq.*, by Plaintiff-Relator Danah Hayes in the name of the United States and herself to recover penalties and damages arising from the Defendants knowing violations of Medicare regulations and laws. Defendants violated laws and regulations to charge for services, which are not medically necessary to extend the stay of patients in Medicare status. The Defendants thereby both increased the cost of care to the government and submitted false claims.

2.     Accordingly, the Plaintiff-Relator files this action to recover penalties and damages on behalf of herself and the U.S. Government.

## I. JURISDICTION AND VENUE

3.     This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

4.     This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

5.     Venue is proper in this jurisdiction pursuant to 31 U.S.C. § 3732(a) because the Defendants maintain an office in this district, and regularly transact business in this district and did so at all times relevant to this Complaint; the False Claims Act confers national jurisdiction.

## II. PARTIES

### A.  Plaintiff-Relator

6.     Plaintiff-Relator Danah Hayes is a nurse with more than 10 years of professional experience, as well as legal training and experience with compliance issues.

**PLAINTIFF-RELATOR'S
ORIGINALCOMPLAINT – Page 2**

7.     She served as an "MDS" or Minimum Data Set Nurse for Lake Lodge Nursing and Rehabilitation, LP from May 9, 2016 through August 28 of 2016.

8.     She was compelled to resign her position, because she was unwilling to participate with management in conducting the practices, which form the allegations presented herein.

9.     None of the allegations herein have been "publicly disclosed" as that term is defined under 31 U.S.C. § 3730(e)(4)(A).

10.    In addition, the Plaintiff-Relator possesses independent knowledge of the information as a result of her employment with Defendants.

11.    Ms. Hayes voluntarily and affirmatively disclosed her allegations to the United States prior to filing this Complaint.

12.    Ms. Hayes is an original source of the allegation and information contained herein. See, 31 U.S.C. § 3730(e)(4).

### B. Defendants

13.    Defendant Lake Lodge Nursing and Rehabilitation, L.P. is a skilled nursing facility located at 3800 Marina Drive Lake Worth Texas, 76135. Defendant Lake Lodge Nursing and Rehabilitation, LP ("Lake Lodge") is a 146 bed facility.

14.    Defendant, Daybreak Venture, LLC ("Daybreak") of 401 N. Elm Denton, TX 76201 owns Lake Lodge Nursing and Rehabilitation, LLP as well as numerous other Nursing Facilities.

### III. SUMMARY OF ALLEGATIONS

15.    The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 3**

16.     The Plaintiff-Relator discovered that the organization was actively working to pressure her and the other Minimum Data Set Nurse(s) to change diagnoses and records in an attempt to justify extended benefits and continue to charge Medicare for the skilled services provided by the facility.

17.     As is the case for many Skilled Nursing Facilities, Lake Lodge maintains a mix of patients mostly on Medicaid and Medicare insurance.

18.     The facility can charge considerably more for Medicare patients, who receive skilled care such as physical, therapy, or speech therapy than for Medicaid patients who do not receive such care.

19.     Therefore, there is an economic incentive to classify patients as requiring Medicare services and to figure out how to ensure that patients in the facility can qualify for such Medicare eligibility.

20.     At Lake Lodge however, the effort extended to altering diagnoses and records in an attempt to justify extended care, which was not medically necessary for the patients.

21.     The patients involved generally lived at Lake Lodge using Medicaid benefits to stay in the facility as nursing home patients.

22.     They could be admitted to a psychiatric facility when and if they had signs of a psychiatric event.  Upon returning to Lake Lodge they may then qualify for 100 days of Medicare post hospital stay benefits.

23.     Eligibility for these benefits effectively can be re-earned if a patient is not on Medicare for 60 days and is admitted to a hospital for a stay of 3 days.  See regulations listed below.

**PLAINTIFF-RELATOR'S
ORIGINALCOMPLAINT – Page 4**

24.     Lake Lodge management extended the post hospital care in Medicare status even

when the patient did not qualify for such care, because they would receive much

higher reimbursements for the same patient in the same facility. Doing so required

putting pressure on staff to change diagnoses and justification for such services.

## IV. RELEVANT REGULATIONS AND CMS PUBLICATIONS

25.     The allegations in the above paragraphs are hereby re-alleged and set forth fully as

above.

26.     CMS describes the process for obtaining and the eligibility requirements for using

Skilled Nursing Facility benefits under Medicare generally:

> Facilities (SNFs)
> Medicare Part A
>
> Part A (hospital insurance) covers beneficiaries for the first 100
> days of their stay in a SNF. The daily rate for the stay, including
> therapy services, is calculated and reimbursed under a Prospective
> Payment System (PPS) that was instituted in 1998. Medicare
> guidance for Part A services is found in **the Resident Assessment
> Instrument (RAI) Version 3.0 Manual. The manual provides
> specific direction about therapy services in** *Chapter 3, Section O*.
> Even when institutional policies are based on Medicare guidelines,
> the interpretation and implementation can differ from facility to
> facility or manager to manager. **SLPs should become familiar
> with the manual rather than relying on interpretations from
> others.**
>
> Completion of the Minimum Data Set (MDS)
> The MDS is a comprehensive summary of the patient's mental and
> physical issues, completed by the fifth day after admission to an
> SNF. The MDS is typically completed by a nurse and triggers are
> provided for assessment of MDS elements by other professionals.
> However, other professionals may sometimes score specialty areas.
> For SLPs, those areas are cognitive patterns,
> communication/hearing patterns, and oral/nutritional status. Time
> spent on MDS assessment does not count toward therapy minutes.
>
> A full description of how to score the MDS 3.0 is on CMS'

**PLAINTIFF-RELATOR'S
ORIGINALCOMPLAINT – Page 5**

website.

### Therapy Treatment Minutes

SLPs, occupational therapists, and physical therapists recommend the frequency and length of sessions that they anticipate a patient will need. This is part of the MDS information about the patient's needs that is combined to determine the patient's RUGs (Resource Utilization Groups) level.  The RUG levels are:

- Ultra High: <u>at least</u> 720 minutes. Minimum 2 disciplines; one at least 5 days.
- Very High: <u>at least</u> 500 minutes. Minimum 1 discipline 5 days.
- High: <u>at least</u> 325 minutes.  Minimum 1 discipline 5 days.
- Medium: <u>at least</u> 150 minutes. Minimum 5 days.
- Low: <u>at least</u> 45 minutes. Minimum 3 days.
  Rules for Recording Treatment Minutes
  ( *RAI Manual, Chapter 3, Section O* ; directly-quoted text is in italics)
- *The therapist's time spent on documentation or on initial evaluation is not included* (Page O 17)
- *The therapist's time spent on subsequent reevaluations, conducted as part of the treatment process, should be counted* (Page O 17)
- *Family education when the resident is present is counted and must be documented in the resident's record.* (Page O 17)
- Treatment minutes are recorded in the MDS in 1 **minute** increments (not 5, 10, or 15 minutes)
- Co-treatment—when two clinicians are each from a different discipline, treating one resident at the same time, both disciplines may count the session minutes in full.
- Group treatment—residents are performing the same or similar activities. A group may not exceed four residents. The allocation of minutes to each patient is calculated by dividing the total length of the session by four (regardless of whether four residents attend). For further clarification, see CMS' Updates and Training for FY2012 PowerPoint [PDF].
- Concurrent treatment—two residents (regardless of payer source of the second resident) are treated at the same time and not performing the same or similar activities. Both patients must be in line-of-sight. The minutes are divided by two after being coded in the MDS.
- Development of a maintenance program and training of caregivers prior to discharge.
  The minutes that define a RUG level are a minimum, not a <u>maximum</u>. There is no Medicare penalty if a patient exceeds the number of minutes in the RUG in a particular week. Patients who receive fewer than the required minutes will be lowered to the next

RUG level.

It is not acceptable to deliver unnecessary (unskilled, not medically necessary) or inappropriate (patient is ill, unresponsive, or refusing treatment) services in order to reach a particular RUG level or meet the weekly number of minutes.

Evaluation Time Does not Count as Minutes Toward RUG Level

- When prospective payment for Part A stays in SNFs was established, the RUG rate was based on observation of time actually spent by clinicians. Time spent on evaluation was included in the calculation of the RUG rates; therefore, evaluation minutes are already accounted for and are not to be reported.

- Instructions from administration or staff to limit evaluation time may be an indirect way of reminding clinicians to maximize therapy time (e.g., in an hour session, 45 minutes would be counted as therapy if the clinician did a 15 minute evaluation). If clinically appropriate, treatment can be performed on the same day as an evaluation and counted toward the therapy minutes.

- If the facility counts productivity using only the treatment minutes recorded in the MDS, the SLP's productivity may appear reduced because evaluation time is not counted.

**What are considerations for the clinician with regard to performing evaluations in SNFs under Part A?**

- Clinicians are ethically bound to deliver services that they believe are appropriate for a patient based on their independent clinical judgment.

- An inflexible rule governing clinical practice (e.g. "evaluations must never exceed 15 minutes") is inappropriate. Clinicians should conduct an evaluation that provides the information necessary to make a diagnosis and develop a Plan of Care.

It should be up to the discretion of the SLP as to what comprises evaluation versus treatment. Valuable information may be gathered through dynamic observation of the patient performing therapeutic activities in addition to administration of standardized or formal testing.

http://www.asha.org/Practice/reimbursement/medicare/Medicare-Guidance-for-SLP-Services-in-Skilled-Nursing-Facilities/

**PLAINTIFF-RELATOR'S ORIGINALCOMPLAINT – Page 7**

27.    The MDS 3.0 Manual makes clear that admission to a skilled nursing facility as

well as the level of treatment is dependent upon MDS Nurse assessments. The

requirements are:

> **Clinical Eligibility Requirements**
> A beneficiary is eligible for SNF extended care if all of the
> following requirements are met:
>
> • The beneficiary has a need for and receives medically necessary
> skilled care on a daily basis, which is provided by or under the
> direct supervision of skilled nursing or rehabilitation professionals.
>
> • As a practical matter, these skilled services can only be provided
> in an SNF.
>
> • The services provided must be for a condition:
>
> for which the resident was treated during the qualifying hospital
> stay, or that arose while the resident was in the SNF for treatment
> of a condition for which he/she was previously treated for in a
> hospital.

CMS RAI Version 3.0 Manual pp.650-651

28.    Medicare benefits in a skilled nursing facility provided after staying in a hospital

are subject to limitation:

> A. Inpatient Hospital Benefit Days
>
> A patient having hospital insurance coverage is entitled (subject to
> the coinsurance requirements described in detail in Pub. 100-01,
> Medicare General Information, Eligibility, and Entitlement Manual,
> Chapter 3, "Deductibles, Coinsurance Amounts, and Payment
> Limitations") to have payment made on his/her behalf for up to 100
> days of covered inpatient extended care services in each benefit
> period
>
> B. Posthospital Extended Care Days
>
> A patient having hospital insurance coverage is entitled (subject to
> the coinsurance requirements described in detail in Pub. 100-01,

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 8**

Medicare General Information, Eligibility, and Entitlement Manual, Chapter 3, "Deductibles, Coinsurance Amounts, and Payment Limitations") to have payment made on his/her behalf for up to 100 days of covered inpatient extended care services in each benefit period. Refer to Pub. 100-01, Medicare General Information, Eligibility, and Entitlement Manual, Chapter 5, Definitions for the definition of SNF inpatient for benefit period purposes.

Publication 100-02 Medicare Benefit Policy Manual Chapter 3 § 20 A-B.

29.     Medicare patients can only remain eligible for benefits for 100 days at a single

admission.

30.     Patients can become re-eligible for benefits after they have been discharged or are

not on Medicare any more for 60 days.

### 10- Benefit Period (Spell of Illness)

A "Benefit period" is a period of consecutive days during which medical benefits for covered services, with certain specified maximum limitations are available to the beneficiary. Under Part A, 60 full days of hospitalization plus 30 coinsurance days represent the maximum benefit period. The period is renewed when the beneficiary has not been in a hospital or SNF for 60 days. Refer to Pub.100-01, Medicare General
Information, Eligibility, and Entitlement Manual, Chapter 3, "Deductible, Coinsurance Amounts, and Payment Limitations" for additional information on benefit periods.

Publication 100-02 Medicare Benefit Policy Manual Chapter 3 §10.

31.     **Psychiatric care alone generally does not provide enough to justify a stay at**

**the SNF under Medicare and receive Medicare funded treatment:**

**NOTE: While a 3-day stay in a psychiatric hospital satisfies the prior hospital stay requirement, institutions that primarily provide psychiatric treatment cannot participate in the program as SNFs. Therefore, a patient with only a psychiatric condition who is transferred from a psychiatric hospital to a participating SNF is likely to receive only non-covered care. In the SNF setting, the term "non-covered care" refers to any level**

**of care less intensive than the SNF level of care that is covered under the program. (See §§30ff.).**

**Publication 100-02 Chapter 8 § 20.1**

32.     Patients must require skilled services for Medicare coverage at such a facility:

### 30 - Skilled Nursing Facility Level of Care - General
**(Rev.      179,      Issued:      01-14-14,      Effective:      01-07-14, Implementation: 01-07-14) A3-3132, SNF-214**

**Care in a SNF is covered if all of the following four factors are met:**

- The patient requires skilled nursing services or skilled rehabilitation services, i.e., services that must be performed by or under the supervision of professional or technical personnel (see §§30.2 - 30.4); are ordered by a physician and the services are rendered for a condition for which the patient received inpatient hospital services or for a condition that arose while receiving care in a SNF for a condition for which he received inpatient hospital services;
- The patient requires these skilled services on a daily basis (see §30.6); and
- As a practical matter, considering economy and efficiency, the daily skilled services can be provided only on an inpatient basis in a SNF. (See §30.7.)
- The services delivered are reasonable and necessary for the treatment of a patient's illness or injury, i.e., are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice. The services must also be reasonable in terms of duration and quantity.

If any one of these four factors is not met, a stay in a SNF, even though it might include the delivery of some skilled services, is not covered. For example, payment for a SNF level of care could not be made if a patient needs an intermittent rather than daily skilled service.

In reviewing claims for SNF services to determine whether the level of care requirements are met, the A/B MAC (A) first considers whether a patient needs skilled care. If a need for a skilled service does not exist, then the "daily" and "practical matter" requirements are not addressed. See section 30.2.2.1 for a discussion of the role

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 10**

of appropriate documentation in facilitating accurate coverage determinations for claims involving skilled care. Additional material on documentation appears in the various clinical scenarios that are presented throughout these level of care guidelines.

Coverage of nursing care and/or therapy to perform a maintenance program does not turn on the presence or absence of an individual's potential for improvement from the nursing care and/or therapy, but rather on the beneficiary's need for skilled care.

Eligibility for SNF Medicare A coverage has not changed with the inception of PPS. However, the skilled criteria and the medical review process have changed slightly. For Medicare to render payment for skilled services provided to a beneficiary during a SNF Part A stay, the facility must complete an MDS.

**EXAMPLE:** Even though the irrigation of a suprapubic catheter may be a skilled nursing service, daily irrigation may not be "reasonable and necessary" for the treatment of a patient's illness or injury.

CMS Publication 100-02 Chapter 8.

33.     Regulations also require documentation to substantiate skilled care determinations:

### 30.2.2.1 – Documentation to Support Skilled Care Determinations (Rev. 179, Issued: 01-14-14, Effective: 01-07-14, Implementation: 01-07-14)

Claims for skilled care coverage need to include sufficient documentation to enable a reviewer to determine whether—

- Skilled involvement is required in order for the services in question to be furnished safely and effectively; and
- The services themselves are, in fact, reasonable and necessary for the treatment of a patient's illness or injury, i.e., are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice. The documentation must also show that the services are appropriate in terms of duration and quantity, and that the services promote the documented therapeutic goals.

Such determinations would be made from the perspective of the patient's condition when the services were ordered and what was, at

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 11**

that time, reasonably expected to be appropriate treatment for the illness or injury. Thus, when a service appears reasonable and necessary from that perspective, it would not then be appropriate to deny the service retrospectively merely because the goals of treatment have not yet been achieved. However, if it becomes apparent at some point that the goal set for the patient is no longer a reasonable one, then the treatment goal itself should be promptly and appropriately modified to reflect this, and the patient should then be reassessed to determine whether the treatment goal as revised continues to require the provision of skilled services. By the same token, the **treatment goal itself** cannot be modified retrospectively, e.g., when it becomes apparent that the initial treatment goal of restoration is no longer a reasonable one, the provider cannot retroactively alter the initial goal of treatment from restoration to maintenance. Instead, it would make such a change on a prospective basis only.

Although the presence of appropriate documentation is not, in and of itself, an element of the definition of a "skilled" service, such documentation serves as the means by which a provider would be able to establish and an A/B MAC (A) would be able to confirm that skilled care is, in fact, needed and received in a given case.

It is expected that the documentation in the patient's medical record will reflect the need for the skilled services provided. The patient's medical record is also expected to provide important communication among all members of the care team regarding the development, course, and outcomes of the skilled observations, assessments, treatment, and training performed. Taken as a whole, then, the documentation in the patient's medical record should illustrate the degree to which the patient is accomplishing the goals as outlined in the care plan. In this way, the documentation will serve to demonstrate why a skilled service is needed.

Thorough and timely documentation with respect to treatment goals can help clearly demonstrate a beneficiary's need for skilled care in situations where such need might not otherwise be readily apparent, as when the treatment's purpose changes (for example, from restoration to maintenance), as well as in establishing the efficacy of care that serves to prevent or slow decline—where, by definition, there would be no "improvement" to evaluate. For example, when skilled services are necessary to maintain the patient's current condition, the documentation would need to substantiate that the services of skilled personnel are, in fact, required to achieve this goal. Similarly, establishing that a maintenance program's services

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 12**

are reasonable and necessary would involve regularly documenting the degree to which the program's treatment goals are being accomplished. In situations where the maintenance program is performed to maintain the patient's current condition, such documentation would serve to demonstrate the program's effectiveness in achieving this goal. When the maintenance program is intended to slow further deterioration of the patient's condition, the efficacy of the services could be established by documenting that the natural progression of the patient's medical or functional decline has been interrupted. Assessments of all goals must be performed in a frequent and regular manner so that the resulting documentation provides a sufficient basis for determining the appropriateness of coverage.

Therefore, the patient's medical record must document as appropriate:

- The history and physical exam pertinent to the patient's care, (including the response or changes in behavior to previously administered skilled services);
- The skilled services provided;
- The patient's response to the skilled services provided during the current visit;
- The plan for future care based on the rationale of prior results.
- A detailed rationale that explains the need for the skilled service in light of the patient's overall medical condition and experiences;
- The complexity of the service to be performed;
- Any other pertinent characteristics of the beneficiary.

The documentation in the patient's medical record must be accurate, and avoid vague or subjective descriptions of the patient's care that would not be sufficient to indicate the need for skilled care. For example, the following terminology does not sufficiently describe the reaction of the patient to his/her skilled care:

- Patient tolerated treatment well • Continue with POC
- Patient remains stable

Such phraseology does not provide a clear picture of the results of the treatment, nor the "next steps" that are planned. Objective measurements of physical outcomes of treatment should be provided and/or a clear description of the changed behaviors due to education programs should be recorded so that all concerned can follow the results of the provided services.

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 13**

Publication 100-02 Chapter 8.

34.    A physician must certify and re-certify the need for services:

### 40 - Physician Certification and Recertification of Extended Care Services
**(Rev. 183, Issued: 04- 04-14, Effective: 05-05-14, Implementation; 05-05-14)**

Payment for covered posthospital extended care services may be made only if a physician (or, as discussed in §40.1 of this chapter, a physician extender) makes the required certification, and where services are furnished over a period of time, the required recertification regarding the services furnished.

The SNF must obtain and retain the required certification and recertification statements. The A/B MAC (A) may request them to assist in determining medical necessity when necessary. The SNF will determine how to obtain the required certification and recertification statements. There is no requirement for a specific procedure or form as long as the approach adopted by the facility permits verification that the certification and recertification requirement is met. Certification or recertification statements may be entered on or included in forms, notes, or other records that would normally be signed in caring for a patient, or on a separate form. Except as otherwise specified, each certification and recertification is to be separately signed.

If the SNF's failure to obtain a certification or recertification is not due to a question of the necessity for the services, but to the physician's or physician extender's refusal to certify on other grounds (e.g., an objection in principle to the concept of certification and recertification), the SNF cannot charge the beneficiary for covered items or services. Its provider agreement precludes it from doing so.

If a physician or physician extender refuses to certify, because, in his/her opinion, the patient does not, as a practical matter, require daily skilled care for an ongoing condition for which he/she was receiving inpatient hospital services (or for a new condition that arose while in the SNF for treatment of that ongoing condition), the services are not covered and the facility can bill the patient directly. The reason for the refusal to make the certification must be documented in the SNF's records.

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 14**

Certifications must be obtained at the time of admission, or as soon thereafter as is reasonable and practicable. The routine admission order established by a physician is not a certification of the necessity for post-hospital extended care services for purposes of the program. There must be a separate signed statement indicating that the patient will require on a daily basis SNF covered care.

In addition, only physicians may certify outpatient physical therapy and outpatient speech-language pathology services.

## 40.1  -Who May Sign the Certification or Recertification for Extended Care Services
**(Rev. 84, Issued: 04-04-14, Effective: 05-05-14, Implementation: 05-05-14)**

A certification or recertification statement must be signed by the attending physician or a physician on the staff of the skilled nursing facility who has knowledge of the case, or by a physician extender (that is, a nurse practitioner, a clinical nurse specialist or, effective with items and services furnished on or after January 1, 2011, a physician assistant) who does not have a direct or indirect employment relationship with the facility, but who is working in collaboration with the physician.

Ordinarily, for purposes of certification and recertification, a "physician" must meet the definition contained in Chapter 5, §70 of this manual.

CMS Publication 100-01 Chapter 4.

35.    The need for inpatient care must be clearly stated:

## 40.2 - Certification for Extended Care Services
**(Rev. 1, 09-11-02)**
The certification must clearly indicate that posthospital extended care services were required to be given on an inpatient basis because of the individual's need for skilled care on a continuing basis for any of the conditions for which he/she was receiving inpatient hospital services, including services of an emergency hospital (see Chapter 5, §20.2 prior to transfer to the SNF. Certifications must be obtained at the time of admission, or as soon thereafter as is reasonable and practicable. The routine admission procedure followed by a physician would not be sufficient certification of the necessity for posthospital extended care services for purposes of the program.
If ambulance service is furnished by a skilled nursing facility, an

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 15**

additional certification is required. It may be furnished by any physician who has sufficient knowledge of the patient's case, including the physician who requested the ambulance or the physician who examined the patient upon his arrival at the facility. The physician must certify that the ambulance service was medically required.

## 40.3 - Recertifications for Extended Care Services
### (Rev. 1, 09-11-02)

The recertification statement must contain an adequate written record of the reasons for the continued need for extended care services, the estimated period of time required for the patient to remain in the facility, and any plans, where appropriate, for home care. The recertification statement made by the physician does not have to include this entire statement if, for example, all of the required information is in fact included in progress.

**NOTE:** In such a case, the physician's statement could indicate that the individual's medical record contains the required information and that continued posthospital extended care services are medically necessary. A statement reciting only that continued extended care services are medically necessary is not, in and of itself, sufficient.

If the circumstances require it, the first recertification and any subsequent recertifications must state that the continued need for extended care services is for a condition requiring such services which arose after the transfer from the hospital and while the patient was still in the facility for treatment of the condition(s) for which he/she had received inpatient hospital services.

## 40.4 - Timing of Recertifications for Extended Care Services
### (Rev. 1, 09-11-02)

The first recertification must be made no later than the l4th day of inpatient extended care services. A skilled nursing facility can, at its option, provide for the first recertification to be made earlier, or it can vary the timing of the first recertification within the l4-day period by diagnostic or clinical categories. Subsequent recertifications must be made at intervals not exceeding 30 days. Such recertifications may be made at shorter intervals as established by the utilization review committee and the skilled nursing facility.

At the option of the skilled nursing facility, review of a stay of extended duration, pursuant to the facility's utilization review plan (if a UR review plan is in place), may take the place of the second and any subsequent physician recertifications. The skilled nursing facility

should have available in its files a written description of the procedure it adopts with respect to the timing of recertifications. The procedure should specify the intervals at which the utilization review committee serves as an alternative to recertification by a physician in the case of the second or subsequent recertifications.

## 40.5 - Delayed Certifications and Recertifications for Extended Care Services
**(Rev. 1, 09-11-02)**

Skilled nursing facilities are expected to obtain timely certification and recertification statements. However, delayed certifications and recertifications will be honored where, for example, there has been an isolated oversight or lapse.

In addition to complying with the content requirements, delayed certifications and recertifications must include an explanation for the delay and any medical or other evidence which the skilled nursing facility considers relevant for purposes of explaining the delay. The facility will determine the format of delayed certification and recertification statements, and the method by which they are obtained. A delayed certification and recertification may appear in one statement; separate signed statements for each certification and recertification would not be required as they would if timely certification and recertification had been made.

## 40.6 - Disposition of Certification and Recertifications for Extended Care Services
**(Rev. 1, 09-11-02)**

Skilled nursing facilities do not have to transmit certification and recertification statements to the A/B MAC (A); instead, the facility must itself certify, in the admission and billing form that the required physician certification and recertification statements have been obtained and are on file.

CMS Publication 100-01 Chapter 4.

## V. FACTUAL ALLEGATIONS

36.     The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

37.     As part of her responsibilities at Lake Lodge, Ms. Hayes confirmed diagnosis and maintained medical records of patients on regular intervals.

38.     As Minimum Data Set ("MDS") Nurse she did assessments, which were supposed to provide the basis for establishing medical necessity, as well as the level of care to be provided to a patient.

39.     Medical records and diagnoses Ms. Hayes performed ordinarily should also form the basis of any decision by the physician who practiced at the facility to certify and or recertify a patient as requiring skilled care under Medicare or direct any other treatment.

40.     Managers of Lake Lodge put Ms. Hayes under constant pressure to change her diagnosis and otherwise to help establish the medical record necessary for patients to be eligible for Medicare to cover treatment for the full 100 days of skilled nursing treatment.

41.     Patients would otherwise only be eligible for Medicaid treatments and kept in the same facility for nursing care at a far lower reimbursement to the facility.

42.     The patients became eligible for Medicare benefits after a brief stay at a hospital from, which they could be sent to Lake Lodge.

43.     The Plaintiff-Relator found that the majority of the patient population receiving Medicare treatment admitted to her facility was referred from a single psychiatric facility.

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 18**

44.    The patients often came to Lake Lodge from the psychiatric facility after having been sent there from Lake Lodge as nursing home Medicaid patients.

45.    It appeared that there was a continual flow of patients going to and from the single psychiatric facility, Ocean Behavioral Hospital of 6200 Overton Ridge Blvd, Fort Worth, TX.

46.    It is rare for psychiatric patients to require Medicare skilled services or even remain in a nursing home for 100 days at a time.  See, CMS Publication 100-02 Chapter 8 § 20.1 NOTE, which indicates that such services are not ordinarily part of a psychiatric diagnosis.

47.    The services requiring skilled care from a nursing facility are more akin to physical therapy and physical ailments than in-patient psychiatric care. As a result, management put pressure on the MDS Nurses to make the psychiatric diagnosis a secondary reason to justify the stay in the hospital.

48.    While these patients were legitimately admitted into the psychiatric facility and could then be legitimately admitted or re-admitted to Lake Lodge, keeping them for an extended period of time on Medicare as requiring skilled care meant there would have to be a diagnosis that provided more of a justification.

49.    For example, a heart condition, or some physical ailment was more appropriate obtain Medicare benefits and provide skilled care in the Lake Land facility.

50.    However, the patients who were admitted were really psychiatric patients.

51.    As such, the Psychiatric patients did not generally need physical therapy or speech therapy, at least not for long periods of time of the type contemplated by a Skilled Nursing Facility for the full 100 days that the Medicare program benefits provide.

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 19**

52.     Diagnoses such as "Muscle Weakness" were often used to justify treatment.

53.     In Ms. Hayes experience, despite the lack of medical necessity, not a single such
        patient was ever discharged from Medicare service prior to the 100 day time limit
        being reached.

54.     This practice is contrary to her experience at other nursing homes especially with
        patients referred from a psychiatric facility in which most are discharged from
        Medicare well in advance of the end of Medicare eligibility because they simply do
        not require such services. At Lake Lodge, the determining factor was not medical
        necessity but the amount of time left on Medicare eligibility

55.     Lake Lodge and Daybreak management had regular weekly Medicare meetings to
        discuss the status of such patients.

56.     These meetings were necessary to prepare the paper work and provide the medical
        back up needed to re-authorize patients to obtain Medicare benefits.

57.     After the initial admission and justification such re-authorization is required
        regularly each thirty days.

58.     As early as June 2016, the Relator began to question the length of stay and the
        diagnosis attached to patients on Medicare.

59.     She received increasing pressure to go along with the lengthy stays, but she did not
        alter her own diagnosis.

60.     On day 40 or 45 of admission she would notice patients could walk around in the
        facility physically just as well as the staff, yet they were being kept for 100 days as
        requiring the care of skilled nursing.

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 20**

61.     The facility was providing and charging for as much as 720 minutes of therapy a week. The facility provided physical therapy, occupational therapy and speech therapy benefits at high levels of care creating high reimbursements for Lake Lodge.

62.     Yet, the Plaintiff-Relator could see no medical necessity to provide such skilled services in the facility to patients who otherwise would stay there under Medicaid.

63.     Indeed, the necessity appeared to be on the part of management to obtain the higher Medicare Re-imbursement rate afforded such patients to the facility.

64.     The Plaintiff-Relator first noticed such a case with patient TS [Full name redacted] who was on approximately day 30 of Medicare treatment and did not appear to need such skilled services.

65.     Ms. Hayes complained to the Director of Rehabilitation, "Gerry" indicating that Mr. TS should not be eligible for Medicare any more. Gerry replied that they should keep on till about day 93 so he would not be a "red flag" to the state. Yet, Lake Lodge ended up keeping him on Medicare for the full 100 days.

66.     The Plaintiff-Relator's questioning of such charges and determinations reached the attention of managers.

67.     There was a regular meeting on Tuesdays to discuss Medicare Reimbursement at the facility.

68.     The meeting was ostensibly to determine, which patients should remain on Medicare services. During one such meeting on or about Tuesday August 9, Lorraine Leija said she understood the pressure to keep the patients on Medicare.

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 21**

69.     Ms. Leija informed the Plaintiff-Relator as well as the other MDS Nurse "Rosa" and the Director of Rehabilitation Gerry that such decisions would all ultimately be their responsibility and she said, "I don't look good in stripes."

70.     Again the Plaintiff-Relator felt the pressure to justify patients on Medicare service.

71.     Then on August 23 the CEO of Daybreak, Larry Snow attended a meeting and said everyone was doing a good job, but they should keep the patients on service.

72.     Sarah and Amber Davidson as well as Gerry and Rosa attended this meeting. Sarah Davidson was the business administrator of Lake Lodge while her mother held a position with Daybreak.

73.      Prior to the meeting, Lorraine Leija again warned the Nurses that she understood the pressure they were under and repeated her statement that "I don't look good in stripes."

74.     Nonetheless, during the meeting, Mr. Snow, the CEO, of Daybreak said to the Relator that the diagnosis and the decision to maintain care for a patient on Medicare was "up to therapy", apparently indicating Gerry, but certainly making clear this was not the Plaintiff-Relator's decision in his view.

75.     The meeting was followed with an email from Ms. Leija to the Plaintiff-Relator and her colleagues and a list of patients for whom they were to find an alternative diagnosis to muscle weakness.

76.     The next day, Wednesday morning, the Plaintiff-Relator was paged to go to Sarah Davidson's office with Amber Davidson also there.

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 22**

77.     Ms. Hayes had received an email referring to patients who should have different diagnoses than "Muscle Weakness" from Lorraine Leija as a follow up to the meeting held the day before.

78.     Sarah and Amber Davidson had additional paperwork from Ocean Behavioral Hospital and asked the Plaintiff-Relator to go back and look at a set of patients and see she could find a medical diagnosis for them.

79.     Sarah and Amber Davidson specifically pointed to the chart of a patient who had "cussed out" her roommate and was diagnosed with depression. Sarah Davidson pointed to the medical portion of the chart from the psychiatric facility and noted that the patient was being treated for a heart condition of "AFIB" or Atrial Fibrillation at the psychiatric facility. She told the Relator that for this patient she could use the AFIB diagnosis as a primary diagnosis, even though of course, the patient had been admitted as a psychiatric patient.

80.     On the basis of this discussion, the Plaintiff-Relator determined that the pressure was going to increase to change her documentation and diagnosis and that she was not going to be able to provide her own independent diagnosis of patients. So, the Relator decided to leave the job that day and not return.

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 23**

## VI. VIOLATIONS OF THE FALSE CLAIMS ACT

### COUNT I
### Violations of 31 U.S.C. § 3729(a)(1)(A)
### Submission of False Claims

81. The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

82. As detailed above, the Defendants are involved in a continual scheme to charge Medicare for skilled nursing services, extend Medicare Coverage for patients who did not qualify for such services and illegally charge the Government for services.

83. Defendants are liable under the Federal False Claims Act for such false claims under 31 U.S.C. § 3729(a)(1)(A).

84. The Defendants are liable to the United States for three times the amount of damages in an amount to be determined at trial that they have caused to the United States as a result of creating these false claims.

85. Each and every such violation of the Federal False Claims Act is also subject to a civil fine under the False Claims Act of between $5,500-$11,000, for conduct occurring prior to November 2, 2015, and a civil fine of between $10,781 and $21,563, for conduct occurring after November 2, 2015.  *See* 81 Fed. Reg. 42491 (June 30, 2016). In addition, Defendants are liable for any increase as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## COUNT II
## Violations of 31 U.S.C. § 3729(a)(1)(B)
## Use of False Statements or Records

86. The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

87. In submitting false claims, the Defendants created false records and false statements including, but not limited to creating false medical records and false records to justify care and extended care in Medicaid status.

88. Defendants therefore violated the False Claims Act prohibition against using false records and statements to get claims paid under 31 U.S.C. § 3729(a)(1)(B).

89. The Defendants are liable to the United States for three times the amount of damages they have created to the United States as a result of using false records and statements.

90. Each and every such violation of the Federal False Claims Act is also subject to a civil fine under the False Claims Act of between $5,500-$11,000, for conduct occurring prior to November 2, 2015, and a civil fine of between $10,781 and $21,563, for conduct occurring after November 2, 2015.  *See* 81 Fed. Reg. 42491 (June 30, 2016). In addition, Defendants are liable for any increase as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**COUNT III**
**Violations of 31 U.S.C. § 3729(a)(1)(G)**
**Reverse False Claims**

91.     The allegations in the above paragraphs are hereby re-alleged and set forth fully as above.

92.     Defendants continual attempts to obtain over payments and keep such overpayments also makes them liable under the Medicare Reporting and returning of Self-Identified Overpayments Rule 42 U.S.C § 1320a-7k(d).

93.     The Defendants failure to return such overpayments therefore makes them liable under the False Claims Act for "reverse" False claims under 31 U.S.C. § 3729(a)(1)(G).

94.     Each and every violation of the Act is subject to triple the amount of damages caused to the United States in an amount to be determined at trial.  Each violation of the act is also subject to a civil penalty of between $5,500-$11,000, violations occurring prior to November 2, 2015, and a civil penalty of between $10,781 and $21,563, for such conduct occurring after November 2, 2015.  *See* 81 Fed. Reg. 42491 (June 30, 2016). In addition, Defendants are liable for any increase in civil fines as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relator, on behalf of herself, the United States, and all States listed herein request that judgment be entered in his favor and against Defendants as follows:

(a) That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq*;

**PLAINTIFF-RELATOR'S**
**ORIGINALCOMPLAINT – Page 26**

(b) That this Court enter judgment against all Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 of between $5,500-$11,000, for each violation of 31 U.S.C. § 3729 occurring prior to November 2, 2015, and a civil fine of between $10,781 and $21,563, for such conduct occurring after November 2, 2015. *See* 81 Fed. Reg. 42491 (June 30, 2016). In addition, Defendants are liable for any increase in civil fines as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus the appropriate amount to the States for damages and civil fines as determined under the above listed State False Claims Acts;

(c) That the Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall not be less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(d) That the Plaintiff-Relator be granted a trial by jury;

(e) That the Plaintiff-Relator, the United States, be awarded pre-judgment interest;

(f) That the Plaintiff-Relator, be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d).

(g) The United States, and the Plaintiff-Relator recover such other relief as the Court deems just and proper

**JURY TRIAL DEMANDED**

Plaintiff-Relator respectfully request a jury trial.


Respectfully submitted on behalf of the Plaintiff-Relator by,


/s/ *Laura E. Calhoun*
LAURA E. CALHOUN
Texas Bar No. 06342400
Albin Roach
5665 Dallas Parkway
Suite 200
Frisco, Texas 75034
Telephone:     214-423-5100
Facsimile:     214-423-5111
E-Mail:          lcalhoun@albinroach.com


-    and –


/s/ *Anthony C. Munter*
ANTHONY C. MUNTER
D.C. Bar No. 483823
Price Benowitz, LLP
409 7th Street, N.W.
Washington, DC 20004
Telephone:     202-417-6000
Facsimile:     202-664-1331
Email:          tony@pricebenowitz.com
**To be admitted *pro hac vice***

**Attorneys for Plaintiff-Relator**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that upon filing on this 6th day of July, 2017, I will cause a true and correct copy of the Motion to Seal the Original Complaint and proposed Order, the Original Complaint and the Civil Cover Sheet to be served via Certified Mail, Return Receipt Requested on each of the following:

**CMRRR#  70161970000045772846**
Civil-Process Clerk
United States Attorney's Office for the Eastern District of Texas
600 East Taylor Street, Suite 2000
Sherman, Texas 75090

**CMRRR#  70161970000045772853**
Jeff Sessions
Attorney General of the United States
U.S. Department of Justice,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*/s/ Laura E. Calhoun*
LAURA E. CALHOUN
Texas Bar No. 06342400
Albin Roach
5665 Dallas Parkway
Suite 200
Frisco, Texas 75034
Telephone:     214-423-5100
Facsimile:      214-423-5111
 E-Mail:         lcalhoun@albinroach.com

**PLAINTIFF-RELATOR'S
ORIGINALCOMPLAINT – Page 29**